FILED
2009 Mar-09 AM 11:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY L. SMITH,                                )<br>                                                             )<br>       Plaintiff,                                         )<br>                                                             )<br>       vs.                                                 )       CASE NO. CV 06-B-1085-S<br>                                                             )<br>CITY OF BESSEMER; OFFICER      )<br>ERNEST RYAN, individually;        )<br>OFFICER DANIEL YORDY,            )<br>individually; MAYOR ED MAY,      )<br>individually; CHIEF NATHANIEL  )<br>RUTLEDGE, individually,               )<br>                                                             )<br>       Defendants.                                    )| |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment. (Doc. 25.) Plaintiff Anthony Smith has sued defendants for injuries suffered as a result of a dog bite. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 25), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every ***reasonable*** inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

## II.  STATEMENT OF FACTS[1]

On the afternoon of June 18, 2004, defendant Officer Ernest Ryan was patrolling a Bessemer neighborhood with his "K-9 partner," a dog named Dusty. (Doc. 27, Ex. 1 ¶ 2.)

---

[1] The Statement of Facts is drawn from the evidence viewed in the light most favorable to plaintiff, the non-moving party, and all justifiable inferences have been drawn in his favor.

He noticed a light-colored Cadillac driving parallel to him on the street one block over. (*Id.*) At the next corner, Ryan turned toward the street on which he had seen the Cadillac, but, by this time, the Cadillac had parked in a driveway. (*Id.*) Ryan testified that the driver of the Cadillac would have had to speed up to have reached the driveway by the time Ryan saw the Cadillac. (*Id.*) As Ryan drove past the driveway, he saw Smith banging and pulling on the back door and he suspected Smith might be a burglar. (*Id.* ¶ 3.) He radioed for backup and defendant Daniel Yordy arrived on the scene. (*Id.* ¶ 5.)

Smith testified that he had driven to the house to see his friend, Bernard Strauter, who dated the resident, Pam Colvin. (Doc. 27, Ex. 2 at 20-21, 23.) He was sitting on or in the Cadillac when he saw the police car drive by; then, he went to the front door and knocked. (*Id.* at 22-23.) When no one answered the front door, he went to the back door. (Doc. 27, Ex. 2 at 24.) While he was knocking on the back door, the police car pulled up and Smith heard a car door shut. (*Id.* at 25.) He testified that he was frightened and began "bamming on the back door." (*Id.* at 26.) When no one came to the door, Smith testified, "I was afraid and I hid." (*Id.* at 28.) He said, "I hid under the house," and "I just sit there." (*Id.*)

Ryan searched the immediate area for Smith, and, when he did not find him, he knocked on the front door. (Doc. 27, Ex. 1 ¶ 4.) Colvin answered the door, and Ryan asked her if anyone had just entered her house. (*Id.*) Smith testified that he heard an officer say to Colvin, "tell the gentleman that came in the house to come back outside." (*Id.*, Ex. 2 at

3

36.) Colvin told Ryan that she had heard pounding on her back door, which scared her because no one ever came to her back door. (*Id*., Ex. 1 ¶ 4.)

While Ryan was talking with Colvin, Yordy looked around the outside of the house. (*Id*., Ex. 3 ¶¶ 4-5.) He discovered an opening leading to a crawl space underneath the house. (*Id*. ¶ 5.) He shined his flashlight into the opening, but he was unable to determine if anyone was hiding in the crawl space. (*Id*.)

While the officers were looking for him, Smith "kind of got relaxed and just [sat] back." (*Id*., Ex. 2 at 41.) He also talked on his cell phone; he called his godmother and his daughter called him. (*Id*. at 44.) He testified as follows:

> Q. What did you say to your [godmother]?
>
> A. I told her where I was.
>
> Q. What did you tell her?
>
> A. I was up under the house. And the police was out there and I didn't know why and I was scared. And could she come around there.
>
> . . .
>
> A. She was telling me – as I was talking to her, she was telling me she was on her way around there. She[ ] was going to call my brothers and my godbrothers, sending them around there and all that, but she was on her way.
>
> And my phone kept ringing. My daughter, she was calling. So my phone kept ringing. And I answered the phone for my daughter. And after then, I got attacked by a dog while I was on the phone with her.
>
> . . .

>       A.  I was on the phone with my daughter, and I was still at my same position.  And I just, I seen his eyes.  And he just attacked me.  And I was . . . kicking at him.  I couldn't pretty much move, but . . . I went to hollering, "Get your dog."

(*Id*., Ex. 2 at 48-50.)

Ryan had taken Dusty from the car, and, after he and Yordy yelled out warnings that the dog was coming in, he had released Dusty into the crawl space under the house.  (*Id*., Ex. 1 ¶ 6; *id*., Ex. 3 ¶ 5.)  Smith admitted that, prior to Ryan's release of Dusty, he had entered the crawl space to hide from the officers and that he had not said anything to the officers.  (*Id*., Ex. 2 at 33, 50.)  He also testified that he did not hear any warnings.  (*Id*. at 49-50.)  After hearing no response to the warnings, Ryan released Dusty, and Dusty immediately ran under the house, found plaintiff, and bit him on his legs.  (*Id*., ex. 1 ¶ 7; *id*., Ex. 3 ¶ 6.)  As soon as Smith yelled out, Ryan called off Dusty, and she returned to him.  (*Id*., Ex. 1 ¶ 7.)

Ryan then told Smith to come out from his hiding place and into view. (Ex. 1 ¶ 8; *id*., Ex. 2 at 52.)  Smith moved into the light of the opening, but he told the officers he could not move after being bitten.  (*Id*., Ex. 1 ¶ 8; *id*., Ex. 2 at 53.)  Ryan put Dusty back in the car and then pulled Smith from under the house.  (*Id*., Ex. 1 ¶ 8; *id*., Ex. 2 at 53.)  Smith testified that neither Ryan nor Yordy "use[d] any kind of physical force" on him.  (*Id*., Ex. 2 at 55.)  However, he testified that Yordy made comments "like it was good that the dog had bit [Smith] and ate [him] up."  He said, "Uh-huh, that's what you get."  (*Id*. at 55.)

Smith was taken to the hospital by ambulance. (*Id*., Ex. 2 at 55-56.) After receiving medical treatment, he was taken to the Bessemer City Jail and released. (*Id*., Ex. 1, ex. 1 at 0013; *id*., Ex. 2 at 73.)

Dusty was purchased in 2002 by the City of Bessemer from Working Dogs International, a company which breeds and trains police dogs. (*Id*., Ex. 1 ¶ 9.) Dusty and Ryan were trained and certified by Working Dogs International in the Patrol/Narcotic Handler Course. (*Id*..) From 2002 until present, Dusty and Ryan have been re-trained and re-certified on a yearly basis. (*Id*.) In addition to their yearly training and certification, Ryan and Dusty perform regular training exercises. (*Id*.)

The Bessemer Police Department's Standard Operating Procedures with respect to the Canine Unit provide in pertinent part:

> OBJECTIVES:  Canines will be trained according to their abilities, for the following tasks to assist the Department's personnel:
>
> . . .
>
> 4. Criminal Apprehension – The dogs will be trained to make reasonable and necessary physical apprehensions.  The dogs will be trained to use only the force necessary to effect the apprehensions of a suspect which the handler has probable cause to believe has committed a felony, or that he or a third party is in danger of a serious injury by another.
>
> 5. Building Search – The canines will be trained to search buildings or structures for the presence of unauthorized persons whom the officers have probable cause to believe have committed an illegal entry.
>
> . . .
>
> B. Responsibilities of Handler

>1. Handlers are responsible for all actions of their assigned canine unless directed by a supervisor.
>
>2. The handler must constantly be aware of the fact that a Police Officer may use only the amount of force which is reasonable and necessary to effect an arrest. In determining the degree of force to be used, he must take into consideration all circumstances known to him.
>
>3. To comply with maintenance training and keep the canine at peek operating status.
>
>4. To keep a log of all training activity, narcotic seizures, apprehensions, or locating missing persons by his canine.
>
>. . .
>
>7. Shall be expected to use his skills to prevent and deter criminal activity, respond to calls for service, and will assist in the location of suspects, lost persons, evidence or contraband through the canine's scenting capabilities.

``(*Id.*, Ex. 4, ex. 1 at 0001, 0006.)

Pursuant to departmental policy, every time Dusty is utilized in the field, Ryan completes a Bessemer Police Department Detector Dog Report. (*Id.*, Ex. 1 ¶ 10.) Since 2002, after approximately 70 field uses, Dusty had only bitten one other suspect prior to the date of the incident involving Smith. (*Id.*)

Neither defendant Police Chief Nathaniel Rutledge nor Mayor Ed May have any knowledge of any complaints regarding Bessemer's Canine Unit units other than this one incident. (*Id.*, Ex. 4 ¶¶ 2, 4; *id.*, Ex. 5 ¶ 2.)

### III.  DISCUSSION

On September 29, 2007, this court granted in part defendants' Motion to Dismiss, leaving only the following claims:  state-law claims for assault and battery against Ryan and Yordy;[2] and § 1983 claims based on excessive force against the City, Rutledge and May.  For the reasons set forth below, the remaining claims will be dismissed.

### A.  CLAIMS AGAINST CITY OF BESSEMER

"[M]unicipal liability may be based upon (1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker."  *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).  Plaintiff's Complaint alleges that the City failed to discipline and/or to terminate Ryan and Yordy despite knowledge of their use of excessive force.  (Doc. 1 ¶¶ 31-34.)  He also alleges that the City "adopted, implemented and enforced [a] de facto custom or policy . . . wherein police officers and police dogs were given blanket authority to use deadly canine force in the arrest  . . . of all suspects regardless of offense."  (*Id*. ¶ 35.)

"The Supreme Court has placed strict limitations on municipal liability under section 1983."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  "[A] municipality may

---

[2]The court dismissed without prejudice the § 1983 claims against Ryan and Yordy, giving plaintiff to opportunity to replead these claims.  Plaintiff, however, did not file an amended complaint.  Therefore, these claims will be dismissed with prejudice by separate order.

be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." *Id*. (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). The city "is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [plaintiff's] constitutional rights." *Id*. However, a municipality may be liable under section 1983 when "the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Id*. (citations omitted).

Because a municipality generally does not have an express policy of inadequately training or supervising its employees, "plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants . . . ." *Id*. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train[,] supervise[, and/or discipline] in a particular area and the municipality made a deliberate choice not to take any action." *Id.*; *see also Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001)("[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct.")(citation and internal quotation marks omitted). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known

9

or obvious consequence of his action." *Board of County Commissioners of Bryan County v. Brown* 520 U.S. 397, 410 (1997). "A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id*. at 411.

Nothing in the record indicates that the City had knowledge of a particular risk of excessive force posed by Ryan and Yordy. Therefore, plaintiff's claims against the City based on its deliberate indifference to such risk will be dismissed.

Plaintiff also contends that the City's Canine Unit policy is unconstitutional; he argues:

> [The] policy permits handlers to subject the same amount of force to violent felons and non-violent felons. The same amount of force could be applied to someone suspect[ed] [of] tax fraud or securities fraud as for murder.
>
> Regardless, Bessemer's policies are contrary to standard practice in that they do not provide that except in exigent circumstances or where there is an imminent danger of death or serious injury, [the] canine should be kept in visual contact by the canine handler. Bessemer policies do not provide that when apprehending suspects the canine shall be commanded to disengage as soon as the suspect is subdued or readily complies with officer direction. Bessemer policies do not provide that canines used for tracking persons should remain on a leash of sufficient length to provide a reasonable measure of safety to the subject of the search without compromising the canine's tracking abilities.
>
> In the instant case, the policies allowed for the officers to apply objectively unreasonable force to locate Smith.

(Doc. 34 at 25-26 [internal quotations omitted].)

As set forth above, the policy at issue provides for the use of reasonable force only; it states, "The handler must constantly be aware of the fact that a Police Officer may use only the amount of force which is reasonable and necessary to [affect] an arrest. In determining the degree of force to be used, he must take into consideration all circumstances known to him." (Doc. 27, Ex. 4, ex. 1 at 0006.) Nothing in the language of the policy directs or allows the canine handlers to use constitutionally excessive force.

Based on the foregoing, the court finds that the City has established that it is entitled to judgment as a matter of law. Therefore, the City's Motion for Summary Judgment will be granted and plaintiff's claims against the City will be dismissed.

**B.  CLAIMS AGAINST RUTLEDGE AND MAY IN THEIR INDIVIDUAL CAPACITIES**

Plaintiff alleges that Rutledge and May failed to discipline and/or terminate Ryan and Yordy despite their knowledge of complaints of excessive force against the officer. "Supervisory liability under § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Valdes v. Crosby*, 450 F.3d 1231, 1236-37 [chech page cite](11th Cir. 2006). Because plaintiff does not allege that May or Rutledge actually participated in his apprehension, he must show some causal connection between their actions, or inactions, and his injuries. *Id*.

This "causal connection" may be proven in the same manner as establishing liability for a municipality; that is –

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Id*.

Plaintiff has presented no evidence of a causal connection between any action or inaction by Rutledge or May and the alleged violation of his constitutional rights. Therefore, Rutledge and May's motion for Summary Judgment will be granted and plaintiff's claims against these defendants will be dismissed.

## C. STATE LAW CLAIMS AGAINST RYAN AND YORDY IN THEIR INDIVIDUAL CAPACITIES

The only claim remaining against Ryan and Yordy is that they assaulted and battered him "in bad faith, or with a malicious purpose, or in a manner exhibiting wanton and willful disregard of plaintiffs' constitutional rights." (Doc. 1 ¶¶ 40, 46.) In Alabama,

> "Assault" has been defined as an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented. In a civil case, the elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. Our supreme court has explained that a battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another.

12

*Quinlan v. Jones*, 922 So. 2d 899, 903 n.1 (Civ. App. 2004)(internal citations and quotations omitted), rev'd and remanded on other grounds, 922 So. 2d 914 (Ala. 2005); *see also Hester v. Brown*, 512 F. Supp. 2d 1228, 1235 (M.D. Ala. 2007).

With regard to Officer Yordy, nothing in the record indicates that he touched Smith or that he ever controlled Dusty at any time during plaintiff's apprehension. Smith testified that Yordy had told him that "it was good that the dog had bit [him] and ate [him] up," after Smith had been removed from under the house. (Doc. 27, Ex. 2 at 55.) Nothing in the record indicates that Yordy touched Smith or directed he be touched, or threatened him. Therefore plaintiff's state-law claims against Yordy will be dismissed.

Also, the court finds the evidence to be similarly lacking with regard to Ryan. Smith testified that he hid under the house from the police; Ryan sent Dusty under the house; Dusty found and bit Smith; Ryan called Dusty; and Dusty released Smith. Nothing in the record supports an inference that Ryan acted with the intent to injure or harm Smith by use of excessive force. Although plaintiff argues that use of the dog to apprehend him was excessive,[3] he has not produced any evidence from which a reasonable jury could infer that Ryan acted with the intent to cause him injury that was unnecessary and unreasonable under

---

[3]The court finds that under the circumstances the use of the dog was not excessive. A suspicious man had been seen at the residence and then vanished when the police pulled up to investigate. The officer did not know if anyone was in the small crawlspace of the building. Use of the dog to determine if an intruder was under the house was reasonable. The dog bit Smith, but released him immediately or very shortly after Smith cried out.

the circumstances. He has failed to show any proof that Ryan acted with malice or in bad faith.

Therefore, Ryan and Yordy's Motion for Summary Judgment is due to be granted and plaintiff's claims against these defendants are due to be dismissed.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law. An Order granting defendants' Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 9th day of March, 2009.

SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE